In re SOUTHERN INDUSTRIAL
BANKING CORPORATION,
d/b/a Daveco.

Thomas E. DuVOISIN,
Liquidating Trustee,

v.

KENNERLY, MONTGOMERY, HOWARD & FINLEY, a General
Partnership, et al.

Bankruptcy No. 3–83–00372.
Civ. No. 3–89–581.
Adv. No. 3–85–0718.

United States District Court,
E.D. Tennessee, N.D.

May 24, 1990.

Gary R. Patrick of Patrick, Beard & Richardson, Chattanooga, Tenn., Donna Temple, U.S. Bankruptcy Court, Knoxville, Tenn., for plaintiff.

W. Kyle Carpenter & H. Bruce Guyton, Knoxville, Tenn., M. Caldwell Butler, Roanoke, Va., for defendants.

## MEMORANDUM OPINION

HULL, Chief Judge.

On April 27, 1989, the Honorable Steven W. Rhodes, United States Bankruptcy Judge, sitting by designation in the United States Bankruptcy Court for the Eastern District of Tennessee, granted a judgment in favor of the plaintiff Thomas E. DuVoisin, Liquidating Trustee of Plan and Creditors' Liquidation Trust, Southern Industrial Banking Corporation [SIBC], finding that the law firm of Kennerly, Montgomery, Howard & Finley and its individual partners, [KMH & F], were liable for an $8,049,486.20 preference under 11 U.S.C. §§ 547(b) and 550 and for a $5,814,000 fraudulent conveyance under §§ 548(a) and 550. 99 B.R. 827. That judgment is now before this court on an appeal filed by KMH & F. The plaintiff Trustee has cross-appealed challenging various prior rulings which dismissed its claims against KMH &

F predicated on securities fraud and effectively eliminated those alleging breach of fiduciary duty, conflict of interest, malpractice and negligence. However, before these appeals can be reached on their merits, this Court must first consider KMH & F's motion to vacate the judgment and dismiss the adversary proceeding on the ground that the bankruptcy court was without jurisdiction over the subject matter of the case. [Doc. 6].

### I. *The motion to dismiss.*

In support of this motion, KMH & F contends that pursuant to the Supreme Court's opinion in the case of *Granfinanciera, S.A., et al. v. Nordberg*, 492 U.S. ——, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), the bankruptcy judge, a non-Article III judge, was without jurisdiction to consider this action to recover the proceeds of a fraudulent conveyance and a preference and that the jurisdictional provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984, particularly 28 U.S.C. § 157, are in violation of Article III of the Constitution of the United States. KMH & F would have this Court dismiss this action or, alternatively, withdraw its reference to the Bankruptcy Court and try the proceedings *ab initio*.

In *Granfinanciera*, the Supreme Court was asked to determine whether a person who had not submitted a claim against a bankruptcy estate has a right to a jury trial when sued by the trustee in bankruptcy to recover an allegedly fraudulent money transfer. The Court held that "the Seventh Amendment entitles such a person to a trial by jury, notwithstanding Congress' designation of fraudulent conveyance actions as 'core proceedings' in 28 U.S.C. § 157(b)(2)(H) (1982 ed. Supp.IV)." 109 S.Ct. at 2787. However, it specifically upheld its previous decision in *Katchen v. Landy*, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), that when a creditor *has* submitted a claim against the estate, he has no right to a jury trial when sued for a preference as part of the process of allowance and disallowance of claims.

In its 1984 amendments to the Bankruptcy Code, Congress drew a new distinction between "core" and "noncore" proceedings. Core proceedings are traditional bankruptcy matters and include preference and fraudulent conveyance actions. Pursuant to § 157(b)(2), bankruptcy judges may adjudicate and enter final orders in core proceedings subject to review of the district court. Noncore cases, which are merely related to bankruptcy proceedings, may also be heard by bankruptcy judges, but they may only recommend their disposition to the district court which enters final judgment after a *de novo* review of any matters to which an objection has been made. KMH & F argues that because the Supreme Court has now held, in *Granfinanciera*, that in making the core/noncore classification, Congress cannot deprive a litigant of his Seventh Amendment right to a jury trial, it has also held, by implication, that the designation under § 157 is unconstitutional and that preference and fraudulent conveyance actions must be tried by Article III judges.

The *Granfinanciera* decision requires no such conclusions. First of all, the Supreme Court most decidedly did not find § 157 unconstitutional. Its decision does not alter the core/noncore distinction; it would only permit a jury trial for those persons who *have not* submitted claims against the estate and who *have* made a demand for a jury. Moreover, the Supreme Court did not suggest that Congress violated the right to trial by an Article III judge. It even left open the possibility that the bankruptcy judge himself might hold the jury trials in these instances. *See,* 109 S.Ct. at 2794 and 2802.

In the case now before this court, KMH & F *did* make a claim against the bankruptcy estate for legal services it had rendered the bankrupt. More importantly, it *did not* make a demand for a jury trial. Pursuant to Bankruptcy Rule 9015 (in effect at that time), this failure to make a timely demand constitutes a waiver of trial by jury. There is no question, therefore, that the bankruptcy court had jurisdiction to try this case. Nothing in *Granfinanciera* is to the contrary.

For this reason, the Court will review findings of fact (few of which are in dispute) on a "clearly erroneous" basis.

Accordingly, KMH & F's motion to vacate the judgment and dismiss this appeal [Doc. 6] will be denied.

II. *KMH & F's appeal.*

A. Background.

As found by the Bankruptcy Court, SIBC was organized in 1929 as an industrial loan and thrift. It raised money by selling investment certificates to the public. It then loaned money at a higher interest rate, historically to consumers but, in recent years, as a result of changes in the state's usury laws, also to commercial clients. C.H. Butcher, Jr., who was chairman of the board of SIBC and a major stockholder at all times pertinent to this action, and David Crabtree, another substantial stockholder, effectively controlled SIBC from 1972 until its bankruptcy on March 10, 1983.

In the fall of 1982, Butcher, who owned numerous banks in east Tennessee besides the SIBC, attempted to acquire two savings and loan associations in Florida. He signed an agreement to acquire the stock of Home Federal Savings & Loan of Palm Beach, Florida and Chase Federal of Miami, for a total purchase price of $50 million, consisting of $25 million in cash, and the balance in a letter of credit and a building called the United American Bank Plaza Building in Knoxville, Tennessee.

In order to demonstrate his ability to fund these acquisitions, Butcher decided to deposit $25 million in escrow. Butcher and KMH & F and a third entity, Butcher–Tennessee Investment Corporation [BTIC], a corporation Butcher formed as a holding company to acquire and hold the stock of the two Florida savings and loans, entered into a specific, written escrow agreement which provided that Butcher and BTIC would deposit and KMH & F would hold $25 million for the purpose of funding the stock acquisition of the two savings and loans. The escrow agreement gave Butcher and BTIC the right to direct the investment of the escrowed funds, the right to have the funds returned should the pur-

chase of the Florida institutions fail, and the right to remove KMH & F as escrow agent.

Part of escrow was to be funded by $10.4 million from the SIBC. On January 5, 1983, at a time when the SIBC was insolvent, it issued three checks to C.H. Butcher, Jr. for $5,910,000., $500,000., and $4,004,000. for a total of $10,414,000. Butcher authorized David Crabtree to sign his endorsement of these checks to the KMH & F escrow account. Initially, the checks were deposited to the KMH & F client trust account and commingled with other client funds. Later, they were withdrawn and deposited in a special escrow account that KMH & F established exclusively for this fund. In consideration for this transfer, SIBC acquired notes from Butcher which came from three sources— the C & C Plaza Limited Partnerships, the Investors Associates and Equity Investors Limited Partnerships, and the Syndicate Cable Investment Trust. The Bankruptcy Court heard lengthy and detailed proof about each of these groups of notes and concluded that they were worthless. Neither party disputes this finding on appeal and it seems to be well supported by the evidence. Because the SIBC was insolvent at the time it transferred the $10,414,000. in exchange for these notes, the bankruptcy court ruled this a fraudulent transfer and voidable within the meaning of § 548(a) of the Bankruptcy Code. This finding has not been disputed on appeal and will be affirmed. The judgment entered against KMH & F for this fraudulent transfer was reduced by $4.6 million (to $5,814,000.) because SIBC immediately sold participations in the C & C Plaza notes to other Butcher banks, reducing the amount it actually lost. The Bankruptcy Court's netting of the transactions to give KMH & F credit for the sale of participations is not contested on appeal and was certainly correct in terms of determining the amount of liability for the transfer in question.

In an attempt to put the money back where he got it, Butcher instructed KMH & F to purchase an $8 million investment certificate from SIBC with some of the escrowed funds on January 6, 1983, the day after the fraudulent transfer mentioned above. KMH & F complied with this instruction and an $8 million certificate was issued to "Kennerly, Montgomery, Howard & Finley Escrow Account." On January 31, 1983, after the plan to purchase the Florida savings and loans had fallen through, the investment certificate was redeemed. The bankruptcy court ruled that this redemption of the investment certificate was a transfer of property for the benefit of a creditor, on account of an antecedent debt (the investment certificate itself), made within 90 days of SIBC's bankruptcy and allowing the creditor to receive more than it would have if the case were in a Chapter 7 bankruptcy. For this reason, he concluded that the redemption of the investment certificate was a voidable preference within the meaning of § 547(b) of the Bankruptcy Code. This finding is also undisputed and will be affirmed.

What is hotly disputed on appeal is whether or not KMH & F should be held liable for this preference and for the fraudulent transfer and, if they should, whether the Bankruptcy Court correctly determined the amount of this liability.

Throughout this lawsuit, the defendants have denied that they were "transferees" for purposes of either the fraudulent transfer or the preference or "creditors" under the Bankruptcy Code for purposes of the preferential redemption of the investment certificate. They have maintained that because they acted only as escrow agent for the funds, and therefore were only a conduit, they should never have been treated as a transferee. It is undisputed that they had no ownership interest in the funds and had only the right to hold them for Butcher and BTIC and deal with them in accordance with their written instructions. KMH & F contends that because they were improperly classified as "transferees," they were unfairly required to meet an equitable "good faith" standard in order to avoid liability for the damages SIBC suffered.

B. Should KMH & F be treated as a transferee?

Once a bankruptcy trustee has been able to avoid a transfer by a debtor on the

grounds that it was fraudulent under § 548(a) or preferential under § 547(b), he turns to § 550 for the power to recover this money or property. Section 550 reads, in pertinent part,

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 547, [or] 548 ... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate good faith transferee of such initial transferee.

(b) The trustee may not recover under section (a)(2) of this section from—

(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or

(2) any immediate or mediate good faith transferee of such transferee.

The Bankruptcy Court found KMH & F to be the an "initial transferee" under § 550(a)(1) as to both the fraudulent transfer and the preference and also a "creditor" for whose benefit a transfer was made for purposes of the preference. In the opinion of this Court, this mixed finding of fact and conclusion of law was correct with regard to the preferential transfer but clearly erroneous with regard to the fraudulent transfer, although KMH & F appears to have been an "immediate transferee" within the meaning of § 550(a)(2) with regard to the fraudulent transfer.

The term "transferee" is not defined in the Bankruptcy Code and there is no legislative history to suggest what the limits of this concept might be. It has been left to the courts to establish a reasonable definition of this term.

KMH & F relies heavily on the case of *Bonded Financial Services, Inc. v. European American Bank,* 838 F.2d 890 (7th Cir.1988), for the argument that, at a minimum, a transferee must be someone who has dominion over the money or other asset and the "right to put the money to ... [its] own purposes." 838 F.2d at 893. In the *Bonded Financial Services* case, the Seventh Circuit refused to accord transferee status to a bank which received a check from the debtor payable to the bank's order, with instructions to deposit the check in the depositor's account, because the bank received no benefit from this transfer and acted merely as a financial intermediary which held the check only for the purpose of fulfilling an instruction to make the funds available to someone else. If the reasoning of that case were applied to the facts of this one, KMH & F would not be accorded transferee status for either the fraudulent transfer or the preference because it never had the right to put the escrowed funds to its own use and merely held the funds for the purpose of fulfilling instructions given by Butcher and BTIC.

The Bankruptcy Court did not follow the Seventh Circuit reasoning but took an approach followed in several other circuits. These courts take the approach that if the entity being sued to recover the preference or fraudulent transfer is technically the "initial transferee" (for example because it was the payee of the checks at issue), but it never obtained control over the funds and acted merely as a financial intermediary, then, rather than simply declaring them not a transferee at all (as the court did in *Bonded Financial Services*), the courts have looked to equitable factors, such as their good faith, in deciding whether or not to hold them liable. In *Nordberg v. Societe Generale (In re Chase & Sanborn Corporation),* 848 F.2d 1196 (11th Cir.1988), a bank which received funds by wire transfer from a Chapter 11 debtor's account in another bank, and used these funds to partially cover the transferee bank customer's existing overdraft, was not held liable, although technically an "initial transferee" because it was a commercial conduit and lacked control over the funds. *In Gropper v. Unitrac (In re Fabric Buys of Jericho, Inc.),* 33 B.R. 334 (Bankr.S.D.N.Y.1983), a law firm and "initial transferee" which held money in its escrow account as a "mere conduit" of funds intended for settlement of a lawsuit was not held liable for

a preference when the suit settled and the money was paid out. As a rule, courts taking this approach were finding that the escrow agents or banks were *technically* transferees if the checks at issue were written to them, but that, because of their good faith and lack of knowledge of the debtor's insolvency, it would be inequitable to hold them liable. Of course, if the defendant was not the "initial transferee" or the "entity for whose benefit the transfer was made," under § 550(a)(1), but an immediate or mediate transferee under § 550(a)(2), then equitable considerations would necessarily come into play to determine whether or not the defendant should be held liable for the transfer.

There are no cases which indicate that the Sixth Circuit would adopt the minority approach followed by the Seventh Circuit in *Bonded Financial Services.* Therefore, the Bankruptcy Court's decision to treat KMH & F as a transferee, even though it was merely a conduit for the funds, will not be disturbed.

 As indicated earlier, because the three checks which made up the fraudulent transfer were not written to KMH & F but to C.H. Butcher, Jr., Butcher himself should have been held the "initial transferee" for purposes of the fraudulent transfer. And, under the terms of the escrow agreement, he and BTIC were the entities for whose benefit the transfer was made. However, because the checks were deposited into KMH & F's escrow account, KMH & F could properly have been held the immediate or mediate transferee under § 550(a)(2). Of course, as transferees under § 550(a)(2), they would be held liable for the fraudulent transfer if they took the transfer with knowledge that it was a voidable transaction. The situation is somewhat different with regard to the preference. KMH & F, acting at the instruction of C.H. Butcher, Jr., actually purchased the $8 million SIBC investment certificate which was issued to "Kennerly, Montgomery, Howard & Finley Escrow Account." And, technically, KMH & F *was* the creditor of SIBC on the investment certificate. When KMH & F redeemed the certificate, it was the "initial transferee" within the meaning of 11 U.S.C. § 550(a), at least with

regard to the check SIBC issued directly to KMH & F in the amount of $2,545,101.60. The Bankruptcy Court found that it was also "the entity for whose benefit the transfer was made" because its investment certificate account was credited. Certainly with regard to the check issued in redemption of the investment certificate, the Court is satisfied that KMH & F was indeed a transferee and, because it never actually had control over the funds, or could use them for its own purposes, the Bankruptcy Court acted correctly in turning to the good faith question before imposing liability. See, for example *Huffman v. Commerce Security Corp. (In re Harbour)*, 845 F.2d 1254 (4th Cir.1988) where an initial transferee, who was simply an intermediary with no actual control over the funds, was held liable for a fraudulent transfer under suspicious circumstances. And while KMH & F cannot be considered an initial transferee with regard to the roughly $5.5 million in notes which completed the redemption, because they were delivered directly from the SIBC to Butcher, the Bankruptcy Court found it to be the "entity for whose benefit the transfer was made" because its account was credited in this amount. These findings, with regard to the preference, appear to be correct.

Accordingly, the Bankruptcy Court's finding that KMH & F was a "transferee" (although not the initial transferee) with regard to the fraudulent transfer and a transferee with regard to the preference will be affirmed.

C. KMH & F's liability for the fraudulent transfer and the preference.

KMH & F's good faith defense depended largely on the credibility of the testimony of Lewis Howard, the partner in the firm who had the most dealings with C.H. Butcher, Jr. and with SIBC. Mr. Howard claimed that he was unaware that fraudulent transfers from SIBC had funded any part of the escrow account and was unaware that SIBC was in any financial difficulty when the investment certificate was redeemed. The Bankruptcy Court did not credit this testimony and this decision is well supported by the evidence in the

record. A careful reading of all the testimony at trial makes it clear that Mr. Howard was fully aware of SIBC's financial difficulties and that some of the money to fund the escrow would have to come from that source. Because he knew or should have known that the transfers were voidable, it was proper to hold KMH & F liable as a transferee for both the fraudulent transfer and the preference. This finding is based simply on KMH & F's knowledge that funds were being taken out of SIBC when it was insolvent.

The Bankruptcy Court made considerable, detailed findings on the good faith issue. Many of these go beyond what was necessary for a finding of liability under § 550, although they do relate to the claims of malpractice and breach of fiduciary duty. These findings are not clearly erroneous and will not be set aside, but they should be separated, conceptually, from the judgment under § 550. This issue will be discussed with regard to the trustee's cross-appeal.

D. The amount of KMH & F's liability for the preference.

■ As indicated earlier, the Bankruptcy Court properly reduced KMH & F's liability for the $10.4 fraudulent transfer to allow for the fact that SIBC managed to sell $4.6 million in participations on the C & C Plaza notes to other Butcher banks. It found KM & H liable for $5,814,000.—or the actual damage SIBC suffered as a result of this transaction.

However, inexplicably, the Bankruptcy Court did not consider the actual damage SIBC suffered as a result of the preference. It properly held KMH & F liable for the amount of the check SIBC issued in redemption of the investment certificate, which was $2,545,101.60., but also held it liable for the balance of the redemption, plus interest, or $5,504.384.60, simply because its account was credited with that amount. KMH & F argues that the Trustee had the burden of proving that the approximately $5.5 million in redemption notes were, in fact, worth their face values. The Trustee replies that it did offer adequate proof on the value of these notes—at least enough to support the Bankruptcy

Court's decision to accord them full value in its judgment against KMH & F. This Court disagrees.

Pursuant to § 550(a), a trustee may recover for the benefit of the estate, the property transferred or the value of such property. It is undisputed that, in this case, the plaintiff trustee sought to recover the value of the redemption notes, not the notes themselves, and that he had the burden of proving their value. The trustee attempted to prove their value through testimony by C.H. Butcher, Jr., who had signed many of the notes himself. Mr. Butcher was asked, "And did those notes have value to you? I mean, could you satisfy obligations, etc. with those notes?" and he answered, "Yes, sir." [Tr. p. 159]. When Mr. Crabtree was question about how the investment certificate was redeemed, he responded that "It was exchanged for a like amount of—$5.5 million dollars of Southern Industrial notes receivable." [Tr. 324]. The only other proof came from Mrs. Smithson, head bookkeeper for SIBC from 1980 through 1983, who testified that SIBC's records indicate that, in the redemption transaction, SIBC's commercial notes were reduced by $5,504,-384.60 and that the investment certificate was reduced to zero. [Tr. 656, 657].

Apparently none of the notes, or copies of them, were actually offered into evidence and not all of them have even been identified. On page 36 and 37 of KMH & F's brief on appeal, they describe eight of these notes with a total face value of between $4.4 and $4.5 million—none of which appear to be secured with any collateral. While, in some cases, it may be appropriate to simply rely on the bank's records as an indication of value of the property transferred, in this case it is not. For one thing, the Court heard extensive evidence from Mr. Ronnie Parham, a Field Office Supervisor for the Federal Deposit Insurance Corporation who was the examiner-in-charge of investigating SIBC, concerning SIBC's insolvency. Mr. Parham testified credibly that approximately 79 percent of SIBC's total loans and 96 percent of its commercial loans were subject to classifications [Tr. 708] and that, as of April 4, 1983, SIBC had

a negative net worth of $22.6 million. [Tr. 684]. Considering the uncontroverted evidence that 96 percent of SIBC's commercial loans were worth less than their face value, it was improper for the Bankruptcy Court to accept that the $5.5 million in notes given in redemption of the investment certificate were worth the amount shown on SIBC' books. Each note should have been the subject of careful examination as were the notes C.H. Butcher, Jr. gave in exchange for the $10,414,000. borrowed from SIBC to fund the escrow account. Accordingly, this action will be remanded to the Bankruptcy Court for specific findings with regard to the value of the notes which were part of the preferential transfer.

█ KMH & F argues, in addition, that even a judgment of $5,814,00. for the fraudulent transfer and $2.545,101.60 for the preference (plus any value the redemption notes might have), results in a windfall to the Trustee because this judgment exceeds the actual harm SIBC suffered as a result of these transactions when they are viewed together. While it would agree that SIBC was harmed in the amount of $5,814,000. by the fraudulent transfer which went into KMH & F's escrow account, it contends that SIBC's position was actually improved to a better state than before the transfer when, on the following day, the escrow account purchased the $8,000,000 investment certificate. As of that date, SIBC had a net gain of $2,186,- 000. And when the investment certificate was redeemed, only $2,545,101.60 in cash was paid out giving SIBC a net loss of only $359,101.60 plus any value the redemption notes might have. KMH & F argues that if the purpose of the recovery sections of the Bankruptcy Code is to preserve the assets of the estate, there is no reason for the Trustee to recover more from these defendants than SIBC actually lost as a result of their maneuvers. The Court agrees with this approach. The Bankruptcy Court should have looked beyond the specifics of each transaction to determine how they diminished the assets of SIBC. There is no reason why the judgment pursuant to § 550 of the Bankruptcy Code should exceed the actual harm suffered by SIBC.

## III. *The Trustee's appeal.*

The Trustee contends that he was improperly denied recovery on several of his theories of liability. The Trustee filed this action to recover the preference and fraudulent conveyance on March 8, 1985. On December 9, 1985, he moved to amend his complaint to add allegations of conflicts of interest, breach of fiduciary duty, malpractice, breach of trust, and negligence with regard to KMH & F's dealings on behalf of SIBC. The amendment was allowed by order of March 7, 1986. After a lengthy struggle to obtain adequate discovery, the Trustee determined that he had grounds to assert an additional claim for recovery based on securities fraud. By Order of October 26, 1987, he was granted leave to file his second amended complaint making these further allegations. With the appearance of the securities claims, the case was removed to district court. In an Order of August 1, 1988, this Court dismissed the securities claims on the ground that SIBC could not show that it detrimentally relied upon its own misleading publications concerning its financial condition.

With the dismissal of the securities claims, the action was remanded to the Bankruptcy Court for trial of the remaining claims, including, presumably, the claims of negligence, malpractice, etc. In September of 1987, the Trustee attempted to file a third amended complaint to recast his securities claims in terms of malpractice on the part of KMH & F—in other words to charge that, in assisting SIBC in its efforts to mislead the public about its financial position, the firm was guilty of legal malpractice. The Bankruptcy Court denied the Trustee leave to file this third amendment to the complaint.

One week before the trial of the case, while the parties were trying to work out an agreed pretrial order, KMH & F raised the affirmative defense of the statute of limitations with regard to the malpractice-related theories of recovery. On April 5, 1989, the Bankruptcy Court ruled, without explanation, that it would not consider the Trustee's claims for damages based on negligence, breach of fiduciary duty or conflict

of interest although it would allow proof on these issues as they related to KMH & F's good faith defense against liability for the preference and the fraudulent conveyance.

On appeal to this Court, the Trustee contends that this Court erred in dismissing his securities fraud claims and that the Bankruptcy Court erred in dismissing his third amended complaint and in denying recovery for KMH & F's malpractice and related torts.

■ The denial of damages for the malpractice and related tort claims raises a serious question. The evidence of malpractice and breach of fiduciary duty on the part of KMH & F was overwhelming and the Bankruptcy Court's findings in this regard are fully supported by the evidence. However, if the Trustee is to be awarded damages on these theories, KMH & F should be allowed to assert the statute of limitations as an affirmative defense. Since these are "noncore" claims, there is no reason to include them in the remand of this action. Pursuant to 28 U.S.C. § 157(d), this Court, may, on its own motion, withdraw, in whole or in part, any proceeding previously referred to the Bankruptcy Court. The Trustee's tort action against KMH & F, predicated on conflicts of interest, breach of fiduciary duty, malpractice, breach of trust, and negligence will be so withdrawn.

As indicated earlier, in an Order of August 1, 1988, this Court dismissed the Trustee's second amended complaint alleging state and federal securities law violations, aiding and abetting securities fraud, and common law fraud. The allegations in that complaint fell into two distinct groups. One group, pleaded under the heading, "The Ridge Scheme," concerned SIBC's attempts to produce a fictitious financial gain on its books and financial statements through bogus sales and lease-back transactions and its subsequent sale of SIBC investment certificates based upon these false or misleading financial statements. This Court conceded that the pleadings alleged securities violations aided and abetted by KMH & F, but ruled that it was the investors who purchased the certificates, not SIBC, through its Trustee, who had standing to pursue this claim. After all, it was SIBC which published the misleading information and only its investors who could conceivably have been the victim of its fraud.

■ The Trustee argues, on appeal, that there is case law suggesting that, as Liquidating Trustee, he does have standing to bring the securities claim. For example, in *Superintendent of Insurance of the State of New York v. Banker's Life & Casualty Company*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), the liquidator of a private corporation alleged 10(b)(5) violations by the corporation's sole shareholder injuring the corporation (Manhattan) itself as well as the creditors. He was found to have standing to bring the securities fraud claim on behalf of Manhattan. However, in that case, the corporate officer and sole shareholder perpetrating the fraud deceived Manhattan's board of directors into authorizing the sale of all of its stock to a purchaser who, by devious means, paid for this stock, not with its own funds but with Manhattan's assets, depleting the corporation of $5,000,000. In other words, Manhattan was the victim, not the perpetrator, of the fraud. There is no indication in the instant case that SIBC's directors were mislead by the actions of C.H. Butcher or any other corporate officer or shareholder. Moreover, there is no evidence that SIBC was harmed by the sales of such securities. On the contrary, there is evidence that SIBC raised $72,500,000. in additional capital as a result of its misleading financial statements. The Court will stand by its original decision with regard to any claim predicated on the "Ridge Scheme".

The second group of allegations, entitled the "Escrow Scheme" concerned the transactions already discussed in this opinion regarding C.H. Butcher's funding of the escrow account as a source of funds with which to purchase two Florida savings and loan associations. In order to fund this account, various Butcher-related corporations executed notes which were sold to SIBC and other financial institutions. The second amended complaint alleges that in the offer and sale of these investment notes, Butcher misrepresented and omitted

material facts in order to deceive potential purchasers. As indicated above, SIBC purchased twenty of these notes for $10.4 million dollars. In the opinion below, the Court assumed, without actually so finding, that these notes *were* securities within the meaning of federal securities law. It simply dismissed this part of the Trustee's claim because there was no indication of "detrimental reliance" or any reason to believe that if C.H. Butcher had fully disclosed to SIBC that it was purchasing notes of little, if any, value, the investment decision would have been different.

Trustee urges, on appeal, that this Court make a specific finding that the notes purchased by SIBC as part of the "escrow scheme" were, in fact, securities. It recommends to the Court the test adopted by the Supreme Court in *Reyes v. Ernst & Young,* — U.S. —, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990). A preliminary review of that test suggests that the notes in question are securities, but the Court will not make any ruling on that question at this time.

It does appear that SIBC was the victim of a securities fraud, aided and abetted by KMH & F, with regard to the "escrow scheme," and that, therefore, the Trustee would have standing to pursue such a claim. However, the damages SIBC suffered as a result of the "escrow scheme" are the same as those already awarded the trustee for the fraudulent conveyance. Accordingly, this Court's previous order, dismissing the second amended complaint, will not be disturbed.

The Court will summarize its various findings and rulings embodied in this memorandum opinion in an accompanying order.

### ORDER

Pursuant to a memorandum opinion this day passed to the Clerk for filing, the Court makes the following rulings in this bankruptcy appeal:

1) KMH & F's motion to dismiss the appeal [Doc. 6] is hereby DENIED;

2) The Bankruptcy Court's finding that the $10,414 million transfer from SIBC to Butcher on January 5, 1983, was a fraudulent transfer within the meaning of 11 U.S.C. § 548(a) is AFFIRMED;

3) The Bankruptcy Court's finding that KMH & F is liable for this transfer under § 550(a) is AFFIRMED;

4) The Bankruptcy Court's finding that the redemption of the $8 million SIBC investment certificate on January 31, 1983, was a voidable preference within the meaning of § 547(b) is AFFIRMED;

5) The Bankruptcy Court's finding that KMH & F is liable for this preference under § 550(a) is AFFIRMED;

6) The extent of KMH & F's liability for the fraudulent transfer and the preference is LIMITED to $359,101.60 plus the market value of the redemption notes;

7) Pursuant to 28 U.S.C. § 157(d), this Court hereby WITHDRAWS THE REFERENCE of the Trustee's noncore claims for damages based on malpractice and related torts. The Trustee is hereby ALLOWED to file his third amended complaint with regard to these claims within thirty (30) days. This complaint should be amended to specify what damages are sought other than those already redressed in the fraudulent conveyance and preference actions. The defendants are ALLOWED to respond to this complaint and raise their statute of limitations defense.

8) The core proceedings in this action are hereby REMANDED to the Bankruptcy Court for a determination of the actual amount of judgment against KMH & F based upon specific findings with regard to the value of the $5.5 million in notes offered in redemption of the $8 million investment certificate.